IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

STEVEN WAYNE ELLER,           :
    Plaintiff,              :
                         :
vs.                           :          CIVIL ACTION 17-0392-CG-M
                         :
KAREN STONE, M.D.,            :
    Defendant.              :
                         :

## Report & Recommendation

Plaintiff Steven Wayne Eller, an Alabama prison inmate proceeding *pro se* and *in forma pauperis*, filed his Complaint[1] under 42 U.S.C. §§ 1983. (Docs. 1, 4). This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72(a)(2)(R), and is now before the undersigned on Defendant's Motion for Summary Judgment. (Doc. 19). After careful review of the pleadings, and for the reasons set out below, it is ordered that Defendant's Motion for Summary Judgment be **granted** in

---

[1] Plaintiff Eller's initial Complaint (Doc. 1) was filed on an outdated from so Plaintiff was ordered to file an amended complaint on the current § 1983 complaint form and was warned that the amended complaint would supersede the original Complaint, so he should not rely on it. (Doc. 3). Plaintiff filed the Amended Complaint on the current form, but with less factual information than the original Complaint had, particularly with respect to the claim against Defendant Dr. Stone. (Doc. 4). Thus, the Court will consider the information from both the original Complaint and the Amended Complaint (collectively, the "Complaint").

favor of Defendant Stone and that the claims asserted against Defendant Stone be **dismissed** with prejudice.

In his Complaint, Plaintiff Eller alleges that Dr. Karen Stone released him from the healthcare ward prematurely, specifically while he was still bleeding and recovering from surgery. (Doc. 4 at 4). Plaintiff Eller was housed in general population approximately a week and was then readmitted to the healthcare unit ward after developing an infection, which required emergency surgery. (*Id.*). Plaintiff Eller is suing Dr. Stone for "not doing a proper job." (*Id.* at 6).

Dr. Stone has answered the suit, denied the allegations against her, and filed a special report in support of her position (Docs. 10, 14), and the Court has converted Defendant Stone's pleadings into a Motion for Summary Judgment. (Doc. 19). Plaintiff Eller has failed to respond to or oppose the motion for summary judgment (despite being granted an extension of time). (Doc. 20). After a thorough review of the record, the Court has determined that this motion is ripe for consideration.

**I. Summary Judgment Standard.**

Summary Judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a)[2]; *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (2009) ("[S]ummary judgment is appropriate even if 'some alleged factual dispute' between the parties remains, so long as there is 'no genuine issue of material fact.'"(emphasis omitted)).

The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by

---

[2]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts.  The standard for granting summary judgment[, however,] remains unchanged. . . . The amendments [have] not affect[ed] continuing development of the decisional law construing and applying these phrases." Fed. R. Civ. P. 56 advisory committee's note on 2010 amendments.

showing, or pointing out to, the district court that the

nonmoving party has failed to present evidence in support

of some element of its case on which it bears the ultimate

burden of proof. *Id*. at 322-24.

> Once the moving party has met its burden, Rule
> 56(e) "requires the nonmoving party to go beyond
> the pleadings and by [its] own affidavits, or by
> the 'depositions, answers to interrogatories, and
> admissions on file,' designate 'specific facts
> showing that there is a genuine issue for
> trial.'" *Id*. at 324. To avoid summary judgment,
> the nonmoving party "must do more than show that
> there is some metaphysical doubt as to the
> material facts." *Matsushita Elec. Indus. Co. v.
> Zenith Radio Corp*., 475 U.S. 574, 586, 106 S. Ct.
> 1348, 89 L. Ed. 2d 538 (1986). On the other hand,
> the evidence of the nonmovant must be believed
> and all justifiable inferences must be drawn in
> its favor. *See Anderson*, 477 U.S. at 255.

*ThyssenKrupp Steel USA, LLC v. United Forming, Inc*., 926 F.

Supp. 2d 1286, 1289-90 (S.D. Ala. Jan. 29, 2013) (citations

omitted).

The requirement to view the facts in the nonmoving

party's favor extends only to "genuine" disputes over

material facts.  A genuine dispute requires more than "some

metaphysical doubt as to material facts." *Garczynski*, 573

F.3d at 1165 (internal citations omitted).  A "mere

scintilla" of evidence is insufficient; the nonmoving party

must produce substantial evidence in order to defeat a

motion for summary judgment. *Id*.  In addition, "[t]here is

no burden upon the district court to distill every

4

potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). More importantly, where "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007); *see also Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. Aug. 29, 2011) ("In cases where opposing parties tell different versions of the same events one of which is blatantly contradicted by the record—such that no reasonable jury could believe it—a court should not adopt the contradicted allegations." (citations omitted) (unpublished)).[3]

## II. Discussion.

According to Plaintiff Eller, he has suffered from right hip dislocation issues since his confinement within the Alabama Department of Corrections (ADOC) in January 2004. (Doc. 1 at 8). In 2008, while incarcerated at Fountain Correctional Facility ("Fountain"), the ADOC began

---

[3] "Unpublished opinions are not considered binding precedent, but may be cited as persuasive authority." 11th Cir. R. 36-2.

providing custom-fit prosthetic "lift shoes" (annually) to treat his hip issues. (Doc. 1 at 8). Plaintiff Eller's lift shoes, however, were "thrown away" by ADOC staff in December 2015, and Plaintiff was reevaluated in the healthcare unit for possible surgical treatment options for his dislocated hip.[4] (*Id.* at 9; Doc. 14-2 at 10, 12).

Plaintiff Eller alleges he was evaluated by an orthopedic specialist, Dr. Xing, in March of 2016 and, due to an infection in his hip, revision of his hip replacement was not possible at that time. (Doc. 1 at 9). Dr. Xing recommended exploratory surgery of the hip, removal of the infected prosthesis, antibiotic spacer placement, and IV antibiotics for 6-8 weeks to clear up the infection. (*Id.* at 10). The surgery was conducted in April of 2016 and was successful. (*Id.*). After months of antibiotic treatment and monitoring by Fountain staff and outside specialists, Plaintiff's infection cleared, and Plaintiff Eller was approved for a total hip replacement. Dr. Xing attempted to revise Plaintiff's right total hip in August of 2016, but was unable to complete the surgery due to the inadequate amount pelvic bone in place. (*Id.*). Instead,

---

[4] Although Plaintiff was examined for a new pair of prosthetic shoes by a representative from BioTech Limb's Brace on February 18, 2016, the fitting and purchasing of the shoes was postponed until after orthopedic surgery. (Doc. 14-2 at 62, 71).

Dr. Xing inserted cadaver bone in place of Plaintiff's pelvic bone and planned to reattempt a total hip revision in 6 to 12 months if the cadaver bone was strong enough to support the total hip replacement. (*Id.*).

It is during this postoperative period that Plaintiff's suit arises.

Following the surgery, Plaintiff Eller was admitted to Fountain's infirmary for three days and then released to general population. (*Id.*). Plaintiff Eller maintains that Dr. Stone acted with deliberate indifference in discharging him from the infirmary while he still had staples and drainings at the surgical site and that she is thereby liable for the staph infection he contracted after leaving the infirmary. (*Id.*). Plaintiff Eller claims he has suffered excessive pain due to having to wait a year for total hip replacement and for not having proper living conditions[5] (*Id.*); thus, the Court will analyze Plaintiff's

---

[5]     Eller bears the burden of establishing that the conditions under which he was held were unconstitutional. To prove such, Plaintiff must show: (1) "a condition of confinement that inflicted unnecessary pain or suffering"; (2) "the defendant's deliberate indifference to that condition;" and (3) "causation." *LaMarca v. Turner*, 995 F.2d 1526, 1535 (11th Cir. 1993), *cert. denied*, 510 U.S. 1164, 114 S. Ct. 1189, 127 L. Ed. 2d 539 (1994)(internal quotation marks and citations omitted).
        Plaintiff Eller fails to carry his burden of overcoming summary judgment on his conditions of confinement claim, as he fails to allege any facts related

claim as a claim for denied medical care in violation of
the Eighth Amendment.

### 1. **Eighth Amendment Standard.**

The Eighth Amendment provides that, "[e]xcessive bail
shall not be required, nor excessive fines imposed, nor
cruel and unusual punishments inflicted." U.S. CONST. amend.
VIII.  "The Eighth Amendment's proscription of cruel and
unusual punishments prohibits prison officials from
exhibiting deliberate indifference to prisoners' serious
medical needs." *Campbell v. Sikes*, 169 F.3d 1353, 1363
(11th Cir. 1999) (citing *Estelle v. Gamble,* 429 U.S. 97,
104 (1976)).  In *Sims v. Mashburn*, 25 F.3d 980 (11th Cir.
1994), the Eleventh Circuit delineated the objective and
subjective portions of an Eighth Amendment claim as
follows:

> An Eighth Amendment claim is said to have two
> components, an objective component, which
> inquires whether the alleged wrongdoing was
> objectively harmful enough to establish a
> constitutional violation, and a subjective

---

to it.  A blanket statement of "not having proper living
conditions" will not suffice.  Specifically, Plaintiff
fails to identify the improper living condition; he fails
to allege how Defendant is responsible for the living
condition or how she was aware of the improper living
condition; lastly, Plaintiff fails to connect the living
condition to any harm suffered.  For these reasons,
Plaintiff has not sufficiently alleged a condition of
confinement claim, and summary judgment should be granted
in favor of Defendant Dr. Stone.

> component, which inquires whether the officials
> acted with a sufficiently culpable state of mind.

*Sims*, 25 F.3d at 983 (citing *Hudson v. McMillian,* 503 U.S. 1, 8 (1992)).  To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need."  *Farrow v. West,* 320 F.3d 1235, 1243 (11th Cir. 2003).  A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Id*. (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1187 (11th Cir. 1994), *overruled in part on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 n. 9 (2002)).  "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm."  *Id.* (internal quotation marks and citation omitted).

It is undisputed in this action that the failure of Plaintiff Eller's total hip replacement and subsequent infection is a serious medical need.  Thus, the Court will focus on the subjective element of Plaintiff's Eighth Amendment claim.  In order to meet the subjective requirement of an Eighth Amendment denial of medical care

claim, Plaintiff must demonstrate "deliberate indifference"

to a serious medical need. *Farrow*, 320 F.3d at 1243.

"Deliberate indifference" entails more than mere

negligence. *Estelle,* 429 U.S. at 106; *Farmer v. Brennan,*

511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate
> indifference" standard in *Farmer* by holding that
> a prison official cannot be found deliberately
> indifferent under the Eighth Amendment "unless
> the official *knows of* and *disregards an excessive
> risk to inmate health or safety;* the official
> must both be aware of facts from which the
> inference could be drawn that a substantial risk
> of serious harm exists, and he must also draw the
> inference." *Farmer*, 511 U.S. at 837, 114 S. Ct.
> 1970 (emphasis added). In interpreting *Farmer*
> and *Estelle,* this Court explained in *McElligott*
> that "deliberate indifference has three
> components: (1) subjective knowledge of a risk of
> serious harm; (2) disregard of that risk; (3) by
> conduct that is more than mere negligence."
> *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at
> 1258 (stating that defendant must have subjective
> awareness of an "objectively serious need" and
> that his response must constitute "an objectively
> insufficient response to that need").

*Farrow*, 320 F.3d at 1245-46.

"Delay in access to medical attention can violate the

Eighth Amendment . . . when it is tantamount to unnecessary

and wanton infliction of pain." *Hill*, 40 F.3d at 1187

(internal citations and quotation marks omitted). "Cases

stating a constitutional claim for immediate or emergency

medical attention have concerned medical needs that are

obvious even to a layperson because they involve life-

threatening conditions or situations where it is apparent that delay would detrimentally exacerbate the medical problem." *Id.*

> The "seriousness" of an inmate's medical needs also may be decided by reference to the *effect* of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. Further, we have held that "[t]he tolerable length of delay in providing medical attention depends on the *nature* of the medical need and the *reason* for the delay." Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay.

*Hill*, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted).

**2. Evidence of Record.**

A review of the voluminous medical records of Plaintiff shows that after his lift shoes were thrown away, he was seen in the healthcare unit on February 2, 2016 for complaints of hip pain and inability to put pressure on his right leg, where he was prescribed pain medication, admitted to the institution's infirmary for a 23-hour observation, and an x-ray was ordered of his hip and leg.[6]

---

[6]    Plaintiff was again examined by the institution doctor on February 5, 9, and 12, 2016. (*Id.* at 24-28).

(Doc. 14-2 at 10, 13, 16-23).  A consult with an orthopedic
specialist was requested and approved after the radiology
report from the February 8, 2016 x-ray scans revealed the
"femoral head portion of the femoral arthroplasty ha[d]
disconnected from the femoral neck/shaft" and "[t]here
[were] multiple fractured screw fragments surrounding the
acetabular cup. (*Id*. at 26-33).  The x-ray was followed by
a CT scan which confirmed the femoral head prosthesis was
dislocated from the femoral neck and further indicated
concern for an infection in the hip hardware.  (*Id*. at 48-
50).  The medical records show Plaintiff remained in
Fountain's infirmary for monitoring from February 9 through
March 17, 2016.  (*Id*. at 38-43, 54-59, 74-85, 89-91).

Due to the complexity of Plaintiff's hip condition,
the initial orthopedic specialist refused to take on the
case and recommended that Plaintiff Eller be evaluated by
an orthopedic trauma surgeon.  (*Id*. at 68, 84, 87).
Approval was obtained for such consultation, and Plaintiff
was seen by Dr. Zhiqing Xing at the University of South
Alabama College of Medicine on March 30, 2016.  (*Id*. at
94).  Dr. Xing diagnosed Plaintiff with a right failed
total hip replacement and infected right hip prosthesis.
(*Id*. at 100).  Dr. Xing ordered further x-rays and
recommended surgery to remove the right hip prosthesis,

antibiotic spacer placement, and further indicated that multiple surgeries and prolonged IV antibiotic treatment may be required. (*Id*.). Dr. Xing qualified that if the infection was controlled, Plaintiff would require additional surgery for revision total hip replacement. (*Id*. at 105).

On April 18, 2016, Plaintiff underwent surgery for removal of right acetabulum hardware and antibiotic spacer placement. (*Id*. at 115). Postoperatively, Plaintiff was given IV antibiotics and Aspirin and discharged on April 22, 2016 with no signs of infection, with controlled pain, and walking with the assistance of a walker. (*Id*.). Plaintiff followed up postoperatively with Dr. Xing and an infectious disease specialist, Dr. Nolan. (*Id*. at 115, 125-126, 129). On May 4, 2016, Dr. Xing examined Plaintiff and noted he was "doing well" and entered follow up orders for diagnostic testing in nine weeks to confirm the infection was controlled and to prepare for the next surgery. (*Id*. at 132). On May 11, 2016, Dr. Nolan examined Plaintiff and ordered that IV antibiotics and lab testing be continued. (*Id*. at 141, 143). Lab work was conducted on Plaintiff and faxed to Dr. Nolan for review weekly, and on June 1, 2016 the PICC line was removed and

IV antibiotics were discontinued. (*Id*. at 181; 187; Doc. 14-3 at 15).

On August 16, 2016, Plaintiff underwent surgery for total right hip replacement, but Plaintiff's pelvic bone was inadequate to support the repair and cadaver bone was inserted for use in a future surgery. (Doc. 14-3 at 41). Plaintiff was discharged from the hospital to Fountain's infirmary on August 19, 2016 with postoperative instructions from Dr. Xing to keep the incision clean and dry, change the dressing as needed, and to do nonweight-bearing activities as tolerated. (Doc. 14-3 at 63, 72, 75). While in the infirmary, he was constantly monitored, ambulated with assistance of crutches, and Plaintiff reported no issues. (*Id*. at 77-85). Plaintiff was discharged from the prison infirmary on August 25, 2016 with orders from Dr. Stone for daily dressing changes, reexamine in week, and for Plaintiff to bathe in Health Care Unit for three months. (*Id*. at 75, 85). Suture removal was scheduled with Dr. Xing for September 7, 2016 (*Id*. at 73), but on September 1, 2016, it was discovered that there was drainage and an odor at Plaintiff Eller's incision site. (Doc. 14-3 at 118, 101-110). A wound culture was collected on September 1, 2016 and tested positive for "few gram pos cocci". (*Id*. at 100).

Plaintiff was readmitted to Fountain's infirmary and monitored by the nursing staff and doctors, was started on IV antibiotics, and prescribed pain medication. (*Id*. at 118, 129-185; Doc. 14-4 at 1-7). Dr. Stone examined Plaintiff on September 7, 2016 and observed a "moderate amount of serosanguinous drainage"[7] at the wound site but no odor or other signs of infection. (*Id*. at 103-104). Dr. Stone then discharged Plaintiff from the infirmary to general population on September 12, 2016 with orders for all medications to continue, daily dressing changes, and for Plaintiff to bathe in Health Care Unit for three months. (Doc. 14-3 at 98, 102).

On September 16, 2016, Dr. Stone reordered a wound culture test, which revealed positive findings for Methicillin Resistant Staph Aureus ("MRSA"), and Plaintiff was readmitted to Fountain's infirmary. (Doc. 14-4 at 11-12). Per the recommendation of Dr. Xing, Plaintiff underwent surgery on for debridement and irrigation of the

---

[7]    Serosanguineous drainage is "[a]mong the most common of all drainage types". It is "thin and watery" and "is a sign that there is damage to the capillaries. . . [which] generally occurs during wound dressing changes." Serosanguineous drainage can be compared to "purulent drainage" which is "generally gray, green or yellow, and . . . thick" and "may be a sign that the wound has an infection." *See Exploring the Various Types of Wound Draining*, Advance Tissue at https://www.advancedtissue.com/exploring-various-types-wound-drainage/ (last visited June 5, 2018).

wound on September 26, 2016. (*Id*. at 13-26, 58). And, was again discharged from the prison infirmary three days after the surgical procedure with orders for daily wound cleaning. (*Id*. at 60, 72).

Dr. Xing examined Plaintiff Eller again on October 5, 2016 and noted that the incision had not yet held, that there remained some drainage at the site, and the wound culture again tested positive for MRSA. (*Id*. at 79). Dr. Xing prescribed daily dry dressings and a rotation of IV and oral antibiotics. (*Id*. at 79-80). At the November 2, 2016, follow up, Dr. Xing found that the wound was healing and prescribed daily dressing changes until the wound was completely healed and a follow up in three months for new x-rays. (*Id*. at 106).

### 3. **Analysis.**

The Court acknowledges the severity of Plaintiff's medical condition, particularly the contraction of the MRSA infection. However, Plaintiff Eller's claims against Dr. Stone, when viewed in light of the record, do not rise to the level of a constitutional violation and, instead, represent negligence at worst. *See Farrow v. West*, 320 F.3d 1235, 1245 (11th Cir. 2003)("[D]eliberate indifference entails more than mere negligence."). Plaintiff has failed to show that Defendant Dr. Stone acted wantonly, with

deliberate indifference to his serious medical needs, *see Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298-99, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991), or that the medical treatment received was so grossly inadequate "as to amount to no care at all." *McElligott v. Foley*, 182 F.3d 1248, 1257 (11th Cir. 1999)("A core principle of Eighth Amendment jurisprudence in the area of medical care is that prison officials with knowledge of the need for care may not, by failing to provide care, delaying care, or providing grossly inadequate care, cause a prisoner to needlessly suffer the pain resulting from his or her illness."); *Whitley v. Albers*, 475 U.S. 312, 319, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986) ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause."). Consequently, Plaintiff has failed to establish a constitutional claim against Dr. Stone, and summary judgment should be granted in favor of Defendant Dr. Stone.

The contraction of surgical site infections is unfortunately all too common[8] and cannot be attributed to

---

[8]     *See* Al-Mulhim, F. A., Baragbah, M. A., Sadat-Ali, M., Alomran, A. S., & Azam, M. Q. (2014). *Prevalence of*

Dr. Stone.  The record shows that prior to Plaintiff's

August 2016 surgery, Plaintiff was regularly examined by

physicians, continuously observed and monitored in the

infirmary, consistently referred to specialists, repeatedly

received diagnostics scans, antibiotic treatment, pain

medication prescriptions, and surgeries. The record further

supports that the postop instructions from Dr. Xing did not

include orders that Plaintiff remain in the prison

infirmary for a specific amount of time, that he be

monitored continuously, or even that he receive antibiotic

medications.  (*Id*. at 61, 71).  The medical records also

reveal that at the time Dr. Stone discharged Plaintiff, he

was ambulating with the assistance of crutches and had no

reported issues at all.  (*Id*. at 75-85).  Dr. Stone

discharged Plaintiff with orders that he received daily

wound cleaning and dressing changes, that he be examined by

doctor once a week, and with a profile to bathe in the

healthcare unit (versus in general population).  (*Id*. at

85-87).  These are not the prescribed orders of one who is

acting with deliberate indifference to a known risk of

_____

*Surgical Site Infection in Orthopedic Surgery: A 5-year Analysis*. International Surgery, *99*(3), 264-268 (2014), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4027911/ (last visited June 5, 2018) (discussing the contraction of Staphylococcus species infections being common in the orthopedic practice and the difficulty of ridding bones and joints of the infection).

infection.  Furthermore, when drainage and odor at the
surgical site incision were discovered during a daily
dressing change, Plaintiff was immediately readmitted to
the infirmary, a wound culture was performed, and
antibiotics were administered.  Dr. Stone continued to
monitor and examine Plaintiff until the infection was
controlled, and once the infection appeared to be clear,
Plaintiff was again discharged from the infirmary with
orders for all medications to continue, daily dressing
changes, and for Plaintiff to bathe in HCU for three
months.  (Doc. 14-3 at 85, 98, 102).  Again, these are not
actions constituting deliberate indifference; rather, Dr.
Stone's chart notes and orders establish that she was aware
of the risk of infection and took precautions to guard
against the same, including collecting and testing wound
cultures while Plaintiff was housed in general population.
The record further confirms that Dr. Stone acted swiftly in
readmitting Plaintiff to the infirmary each time an
infection was suspected, as well as communicating with Dr.
Xing about the course of treatment, and obtaining surgical
debridement and irrigation of the wound after Plaintiff
tested positive for MRSA on September 16, 2016.  (Doc. 14-4
at 11- 13-26, 58).  Further bolstering Dr. Stone's medical
decision and judgment call to release Plaintiff into

general population is the fact that following the surgical removal of the infection, Plaintiff again only remained in the infirmary for three days postoperatively, and Dr. Xing did not order otherwise nor did he prescribe antibiotics. (*Id.* at 60, 72).

No doubt the wound infection has hindered Plaintiff's healing and plans for total hip replacement. However, the circumstances surrounding this surgical complication do not rise to a constitutional level given the extreme amount of medical care and attention Plaintiff has received. The mere fact that Plaintiff Eller disagrees with the decision to discharge him from the infirmary postoperatively or simply prefers a different course of treatment does not state a valid claim of medical mistreatment under the Eighth Amendment. *See Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (whether defendants "should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding" constitutional liability); *Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991) (explaining that a difference in medical opinion between the prison's medical staff and the inmate about the inmate's course of treatment will not support a claim of cruel and unusual punishment). "When a

prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." *Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989).

Additionally, while Plaintiff's total hip replacement has indisputably been postponed, Plaintiff has put forth no allegation or evidence that the delay was caused for any other reason than medical necessity. *See Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("[I]f necessary medical treatment has been delayed for non-medical reasons, a case of deliberate indifference has been made out."); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1187-88 (11th Cir. 1994) (quotation marks omitted), *abrogated on other grounds by Hope v. Pelzer*, 536 U.S. 730, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (For a delay in medical treatment to rise to a constitutional level, it must be "tantamount to unnecessary and wanton infliction of pain," and [the Eleventh Circuit] require[s] an inmate who alleges a delay-based Eighth Amendment claim to "place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed."). Thus, there is no established medical deliberate indifference claim, and Defendant Dr. Stone is entitled to summary judgment on the claims asserted against her.

### III. Conclusion.

Based on the foregoing, it is recommended that Defendant's Motion for Summary Judgment be **granted**, that Plaintiff Eller's action against Defendant Dr. Karen Stone be **dismissed** with prejudice.

The instructions that follow the undersigned's signature contain important information regarding objections to the report and recommendation of the Magistrate Judge.

**NOTICE OF RIGHT TO FILE OBJECTIONS**

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 72(b); S.D. ALA. L.R. 72(c). The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period

for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice." 11th Cir. R. 3-1. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this 6th day of June, 2018.

s/BERT W. MILLING,JR.
UNITED STATES MAGISTRATE JUDGE